**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  jwilner@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMARGO COUTURE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OPENAI GLOBAL, LLC,<br><br>Defendant. | Case No. 3:26-cv-03000-H-GC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Amargo Couture ("Plaintiff") brings this action on behalf of herself and all others similarly situated against OpenAI Global, LLC ("Defendant" or "OpenAI").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all United Staes residents who have accessed and entered queries into ChatGPT.com (the "Website"), a website Defendant owns and operates.

2.      Defendant owns and operates ChatGPT, an AI chatbot service designed to provide answers to almost any question a user asks, including queries regarding sensitive and personal topics like the user's finances, health, and legal issues. So much information is put into ChatGPT that some sources estimate " The average company leaks confidential material to ChatGPT hundreds of times per week."[1] The same is true of individuals, who increasingly rely on ChatGPT to gather information and advice to their most personal issues. As such, personal privacy on ChatGPT  is an issue with broad implications for individuals' control of their privacy and personal information.

3.      Despite reasonable expectations of privacy, and Defendant's legal duties to prevent the disclosure of such private information, Defendant disclosed information provided by consumers to Meta Platforms, Inc. ("Meta") and Google, LLC ("Google") (together, the "Third Parties") by incorporating technology owned by each third party into the code of its website.

---

[1] 1% OF DATA EMPLOYEES PASTE INTO CHATGPT IS CONFIDENTIAL, Cyberhaven, February 28, 2023, https://www.cyberhaven.com/blog/4-2-of-workers-have-pasted-company-data-into-chatgpt.

4.    Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA"), the California Invasion of Privacy Act ("CIPA") §§ 631 and 632, and the California Constitution and Common Law by disclosing Plaintiff's and Class Members' private and confidential information without consent.

## PARTIES

### *Defendant*

5.    Defendant OpenAI Global, LLC is a Delaware Limited Liability Corporation with its principal place of business at 1455 3rd Street San Francisco, CA, 94158.  Defendant owns and operates the Website.

### *Plaintiff*

6.    Plaintiff Amargo Couture is a natural person and citizen of California, residing in San Diego, California.

7.    Throughout 2025 and 2026, Plaintiff visited the Website and entered queries related to sensitive information about her health, finances, and other private information.

8.    Plaintiff has had an active Facebook account for several years.  Plaintiff routinely accesses Facebook on their computer using the same browser she used to access the Website.

9.    Plaintiff also has had an active Google account for several years and is routinely logged into that account while using the same browser she used to access the Website.

10.    Pursuant to the systematic process described herein, Defendant aided and assisted the Third Parties with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII"), and related confidential information.  Defendant aided and assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

2

11.  By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and confidential communications.

## JURISDICTION AND VENUE

12.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

13.  This Court has personal jurisdiction over Defendant because the Website collected and disseminated the information giving rise to this lawsuit in this District, Defendant conducts substantial business in this District, Defendant's Website allows California residents to use the Website in California, and the conduct giving rise to this action arises out of and relates to that business.

14.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

**A.  Background of the California Information Privacy Act ("CIPA")**

15.  The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

16.  To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

3

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.     The applicability of Cal. Penal Code Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

18.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**A.     Defendant's Website**

19.     Defendant's Website hosts ChatGPT, "a generative AI chatbot developed by OpenAI and powered by their proprietary GPT family of generative artificial intelligence (gen AI) models. It uses natural language processing (NLP) to

4

hold lifelike conversations with users and generate content including articles, text summaries, advice and more."[2]

20.    Users enter queries on virtually any topic into the Website and receive conversational responses in writing with answers to their questions. Millions of people use ChatGPT to get answers in the way people have become accustomed to searching for information on Google and other sites.

**B.    Overview Of The Wiretaps**

**(1)    Meta's Platform and its Business Tools**

21.    The Facebook social-media platform, owned by Meta, describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

22.    With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[6]

23.    Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users so effectively because it surveils user activity both on and off its sites.[8]  This allows Meta to make inferences about users beyond what they

---

[2] What is ChatGPT?, IBM, https://www.ibm.com/think/topics/chatgpt/.

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com.

[6] *Id.* at 63.

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

CASE NO. 3:26-CV-03000-H-GC

explicitly disclose, like their "interests," "behavior," and "connections."[9] Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[10]

24.    Advertisers can also build "Custom Audiences."[11] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[14]

25.    As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and

---

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

6

services."[15] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

26. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17] Advertisers can even create their own tracking parameters by building a "custom event."[18]

27. One such Business Tool is the Facebook Pixel (the "Facebook Pixel"). Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites. The Facebook Pixel "tracks the people and type of actions they take."[19] When a user accesses a website hosting the Facebook Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers. This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the

---

[15] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[16] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[17] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

7

Facebook Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

28.    Defendant chose to include the Facebook Pixel on its Website.

29.    Meta's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Meta's business customers can put on their website to "[m]ake sure your ads are shown to the right people.  ***Find … people who have visited a specific page or taken a desired action on your website***." (Emphasis added.)[20]

30.    Meta instructs such business customers that:

> Once you've set up the [Facebook] Pixel, ***the pixel will log when someone takes an action on your website***. Examples of actions include adding an item to their shopping cart or making a purchase.  ***The Pixel receives these actions, or events***, which you can view on your [Facebook] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take.  ***You'll also have options to reach those customers again through future Meta ads***.[21]

31.    The Facebook Pixel code enables Meta not only to help Defendant with advertising to its own users outside the Website, but also to include individual users among groups targeted by ***other*** Facebook advertisers relating to the conditions about which users took actions on Defendant's Website.

32.    Meta's Business Help Center explains:

---

[20]  Meta, ABOUT META PIXEL https://www.facebook.com/business/help/ 742478679120153?id=1205376682832142 (last visited Dec. 26, 2023).

[21]    *Id*. (Emphasis added.)

CASE NO. 3:26-CV-03000-H-GC

Meta *uses marketing data to show ads to people who are likely to be interested in them*. One type of marketing data is website events, which are *actions that people take on your website*.[22]

33.  In other words, Meta sells advertising space by highlighting its ability to target users.[23]  Meta can target users so effectively because it surveils user activity both on and off its sites, including Facebook.[24]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[25]

34.  Each time Meta intercepts this activity data, it also discloses a user's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

35.  A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

36.  When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

---

[22] Meta, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added.)

[23] Meta, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

[24]  Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[25] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting

CASE NO. 3:26-CV-03000-H-GC

37.    One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[26]   Facebook, at a minimum, used the fr cookie to identify users.[27]

38.    If a visitor had never created an account, an even smaller set of cookies was transmitted.

39.    At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[28]

40.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[29]   Otherwise, the c_user cookie is cleared when the browser exits.[30]

41.    The The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[31]   If that happens, the time resets, and another 90 days begins to accrue.[32]

42.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[33]   If that happens, the time resets, and another 90 days begins to accrue.[34]

---

[26] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[27] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[28] *Id.*

[29] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[30] *Id.*

[31] *See id.*

[32] Confirmable through developer tools.

[33] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[34] Also confirmable through developer tools.

CASE NO. 3:26-CV-03000-H-GC

43.    The Facebook Pixel used both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Website.[35]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[36]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

44.    Meta at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  As demonstrated below, Defendant discloses these identifiers alongside the event data.

45.    The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user.

### (2)    Google Analytics' Tracking Code

46.    "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[37]

47.    To discern when "two different [users] interact with [a] website[,] … Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[38]  Reporting identities are combinations of "identifiers … called *identity spaces*"—namely, "User-ID"; "user-provided data"; "device ID"; and "modeling."[39]

---

[35] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[36] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[37] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[38] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[39] GOOGLE, [GA4] REPORTING IDENTITIES, https://support.google.com/analytics/

- A "User-ID" is a "persistent ID[,]"[40] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed] … to [] users[,] … typically [] during login."[41]

- "User-provided data" consists of contact details such as "email, phone, name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[42] Although these personal details are "hash[ed],"[43] the reality is that, even in hashed form, they are traceable to individuals.[44]

- A "device ID" is a "browser-based or mobile-app-based identifier."[45] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a

---

answer/10976610.

[40] *Id.*

[41] GOOGLE, [GA4] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, https://support.google.com/analytics/answer/9213390.

[42] GOOGLE, [GA4] USER-PROVIDED DATA COLLECTION, https://support.google.com/analytics/answer/14077171.

[43] *Id.*

[44] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://tinyurl.com/56p3a82j ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating.").

[45] GOOGLE, [GA4] DEVICE ID, https://support.google.com/analytics/answer/9356035.

12

unique installation of the app."[46]

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[47]

48.    Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in."[48] "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads."[49]

49.    Thus, with Google Signals, "Google is able to develop a holistic view of how those users interact with an online property from multiple browsers and multiple devices. For example, [one] can see how users browse products on [a] site from a phone, and later return to complete purchases from a tablet or laptop."[50]

50.    This gathered information is used for marketing and advertising. Namely, "Google signals enables[ r]emarketing … Google Ads and other Google Marketing Platform advertising products can use third-party advertising identifiers enabled by Google signals to serve ads in … remarketing campaigns to Google users."[51]

51.    Put simply, "[r]emarketing lets [Google's clients] re-engage users based on their behavior in [an] app or on [a] site. When users fit the behavioral profile for

---

[46] *Id.*

[47] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/analytics/answer/11161109.

[48] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[49] *Id.*

[50] *Id.*

[51] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

13

an audience (for example, Reached Level 9), they are added to that audience and are eligible to see ads related to that earlier behavior."[52]

52.     Gathered information is also used for analytics. Google Signals helps "[r]eport on cross-device user counts," "[r]eport and understand different groups of users based on the different device combinations they use," [r]eport on and understand [] cross-device marketing performance (e.g., channels, campaigns, etc.)," and "[u]nderstand the customer journey across devices by analyzing user-based reports (active users, funnels, pathing)."[53] In this sense, "Google signals enables[] … Google Analytics [to] collect[] additional information about demographics and interests … from users who are signed in to their Google accounts."[54]

53.     Regardless of which service collects the information, Google uses the information for reports and insights associated with Google Analytics.

Real-Time Reporting
- Monitor activity on your site or app as it happens.

Acquisition Reports
- See how users land on your site or app and understand the effectiveness of your marketing.
    - User Acquisition[:] Discover how users reach your site or app through different paid and organic sources.
    - Traffic Acquisition[:] See a session-based view of traffic and engagement on your site or app through different paid and organic traffic sources.

Engagement Reports
- Better understand what content drives engagement and conversions on your site or app.

---

[52] GOOGLE, ENABLE REMARKETING WITH GOOGLE ANALYTICS DATA, https://support.google.com/analytics/answer/9313634.

[53] Id.

[54] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

CASE NO. 3:26-CV-03000-H-GC

- o Events Report[:] Get a detailed view of user actions, system events, or errors.

- o Conversion Report[:] See how all your marketing channels are working together to drive conversions.

- o Pages and Screen Report[:] See which web pages and app screens users engage with the most.

Monetization Reports
- See how much revenue your site or app generates whether it's from ecommerce, subscriptions, or ads.
  - o Ecommerce[:] Analyze purchase activity including product and transaction information, average purchase revenue, average purchase revenue per user, and other data.

  - o In-App Purchases[:] Improve your app monetization with insights about the highest performing products and subscriptions.

  - o Publisher Ads[:] See ad revenue that your app generates using [] Google Analytics for Firebase SDK.

54.    Google Analytics also tracks portions of users' IP addresses for "analysis of general location trends" despite masking the full IP address of a user.[55]

55.    This gathered information is used for marketing and advertising. Specifically, Google "Analytics is designed to work seamlessly with other Google solutions and partner products" and can "unlock deeper insights into [advertising]

---

[55] "In GA4, IP anonymization is automatically enabled by default. This means you don't have to configure anything—Google Analytics will automatically mask user IP addresses before they're processed or stored." SELINE ANALYTICS, WHAT IS IP ANONYMIZATION IN GOOGLE ANALYTICS?, https://seline.com/google-analytics-terms/ip-anonymization.

CASE NO. 3:26-CV-03000-H-GC

campaign performance from Google Ads, Display & Video 360, and Search Ads 360."[56]

56.    Google Analytics integrates with Google Ads so that clients, like Defendant, can "[s]ee [] Ads data together with [] website and app performance data in the Google Ads reports in Analytics."[57]  Google Analytics integrates with Display & Video 360 and Search Ads so that clients, like Defendant, can "[e]xport conversions created in Analytics," "create audiences that are predicted to take [certain] actions[,]" and "use them for automated bidding" in Display & Video 360 and Search Ads 360.[58]

57.    Gathered information is also used for analytics. With Google Analytics, clients, like Defendant, can "apply[] Google's machine learning models, … analyze [] data[,] and predict future actions people may take, like making a purchase or churning."[59]

58.    In addition, Google Analytics can "automatically detect and surface actionable insights from [gathered] data like important changes, new trends, and other growth opportunities."[60] And Google can provide "[a]nswers to [marketers' q]uestions … in natural language[,] … to quickly find [] metric[s], report[s], or insights."[61] Through Google Analytics' "[u]ser [e]xploration" functions, it is even possible to "[s]elect specific groups of users and drill down deeper to understand how those users engage with [a] site or app."[62]

---

[56]  GOOGLE, ANALYTICS FEATURES, https://marketingplatform.google.com/about/analytics/features/.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

16

59.    Thus, Google Analytics furnishes "a complete understanding of [] customers across devices and platforms[,] … [and] gives [] the tools[] … to understand customer journey and improve marketing ROI."[63]

60.    Defendant discloses information to Google Analytics for such marketing, advertising, and analytics purposes.

### C.    Defendant discloses ChatGPT Users' Query Topics and PII to Meta and Google

### (1)    Defendant Discloses Users' Query Topics and FIDs to Meta

61.    When users enter queries into ChatGPT, Defendant discloses that information to Meta in real time.

62.    For example, when a user asks "Who won the Superbowl in 2005?" That information becomes the header value for the users' browser tab.



---

[63] GOOGLE, ANALYTICS OVERVIEW, https://marketingplatform.google.com/about/analytics/.

63.   When that information is entered into ChatGPT, Defendant, through the Facebook Pixel, sends a simultaneous transmission to Meta containing both the topic information and the c_user and fr cookies, both of which contain the user's FID.

```
GET   www.facebook.com/tr/
Tue Apr 28 18:18:03 EDT 2026

Cookies:
datr=T83oaR2J50Qs9sW52WvtS0sE
sb=T83oaR9jrmXOQcpREOJJSWiS
ps_n=1
c_user=100          2
fr=1ZZ94Ug0KeQJQwxVt.AWfclyabt_XFo6iFb6oAxsZsClwsaVH797arAMC1hJFNfkl1XYY.Bp6M32..AAA.0
.0.Bp6M32.AWf8sG-zWpF6U9WtsjbdI-OzHz8
xs=30%3AuyIKXRFj-yfmww%3A2%3A1776864753%3A-1%3A-1%3A%3AAcxW0GuVe_O2iiWAO4xxBBlk
eJujzKNySE4pBwczoQ
ar_debug=1

Data:
id: 1105138088231444
ev: PageView
dl: https://chatgpt.com/
rl: https://auth.openai.com/
if: false
ts: 1777414683016
sw: 1920
sh: 1080
v: 2.9.310
r: stable
ec: 9
o: 12318
fbp: fb.1.1777313248057.150800002854048182
eid: ob3_plugin-set_1fde46eab6d6185f54f5d4ac1101abed38474b3d751059ead62873228b169750
ler: other
cdl: API_unavailable
pmd[title]: Super Bowl 2005 Winner
pmd[locale]: en-US
pmd[description]: ChatGPT is your AI chatbot for everyday use. Chat with the most advanced AI to
explore ideas, solve problems, and learn faster.
```

64.   Transmissions from users' browsers to the Facebook Pixel occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser,

18

CASE NO. 3:26-CV-03000-H-GC

without alerting the individual that this is happening. The Pixel, installed by Defendant causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to Meta's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Meta's code and concurrent with the communications with the host website.

65.     Meta receives each request from the ChatGPT via the Facebook Pixel and immediately views the information contained therein, processes it, and adds it to datasets to target advertisements in the manner described above.

**(2)     Defendant Discloses Users' Query Topics, and User IDs, and Email Addresses to Google**

66.     Similarly, when a user enters information  into ChatGPT, Defendant discloses that information to Google in real time.

CASE NO. 3:26-CV-03000-H-GC

67. When a user creates a ChatGPT accounts or logs in using their email address, Google Analytics intercepts a "hashed" version of that email address, marked by the "em" identifier in the data.

```
url: https://chatgpt.com/
ref: https://auth.openai.com/
rcb: 7
label: y9qYCOzYzl8cEJen0JE-
capi: 1
gtm_ee: 1
frm: 0
tiba: ChatGPT
hn: www.googleadservices.com
rdp: 1
npa: 0
pscdl: noapi
auid: 1466953558.1777313248
uaa: x86
uab: 64
uafvl: Google%20Chrome;147.0.7727.117|Not.A%2FBrand;8.0.0.0|Chromium;147.0.7727.11
uamb: 0
uam:
uap: Windows
uapv: 19.0.0
uaw: 0
ec_mode: c
_tu: AAI
gcl_ctr: 11~0~0~0
data: event=conversion
category: acrcp_v1_512
em: tv.1~em.1b30b287d48ec5fd0d3fc6dc7ec57f0579ac6362a8862f198beb537f14c51f75
```

68. Google Analytics is designed to collect information about website visitors that can be matched to an individual's existing profile for the purpose of sending targeted advertising to that user. Though AdTech companies claim "hashing" would prevent a party that is not Google from obtaining the subscriber's email address, Google, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to its existing advertising profiles.

CASE NO. 3:26-CV-03000-H-GC

69.    Defendant also transmits the Secure-3PSID cookie, which contains the user's Google profile ID, along with several other Google Signal cookies.

```
GET   www.google.com/pagead/1p-conversion/16679965591/
Tue Apr 28 18:17:19 EDT 2026

Cookies:
__Secure-3PSID=g.a0009Aho7pHowculd_CqsDGWR4lem_DONTKqXANN28KlamHyTsrBdohsDuhSR75j
6ZHzsJJZGQACgYKAX8SARcSFQHGX2MiQDBcBrVF0uihhC8gffuzOBoVAUF8yKqkP_E8LG0pNeYngW
LEH5Xd0076
__Secure-3PAPISID=uYZhg7-_e_1yfPJH/Aq2PS7xP9IIO8_TL_
NID=531=GEXg2S2r2IDTvzbJU2b3jLWKQEvpQh2FghE8EDnVldV2DwFGKbdQiZXYFqVDZxGvxVipeTouj
4wUeLkS_RSu1WOYxJxt47DTWc9Zkr3JnHk5-_EULOoh6IBTaJmI8IUERfzW8sgwGuuJFs8xof40vVGmV
qWstdFuPmiF6P_T-L20BfLDSka45KZqdfrt3vesdbtv4hNyKPC2-gOSrPAQ1pZWEMESn_MN-PwEfHgHik_
9I2e36pPI-hbGeU3v1nD7d7PlgE7TIZKnTI4GfHgtDFsEcqtEXsqr7OE1v7mf_DN505DcAv986bLkwUi-DoEy
SkyZoNHOtuy6PANE
__Secure-3PSIDTS=sidts-CjYBhkeRdzW9MG0odqvSa01z4ljxin9FS26sLFdMrFPidki2j7-kEkmQWKmgkco
Wcr65YXHP7IEQAA
__Secure-3PSIDRTS=sidts-CjYBhkeRdzW9MG0odqvSa01z4ljxin9FS26sLFdMrFPidki2j7-kEkmQWKmgk
coWcr65YXHP7IEQAA
__Secure-3PSIDCC=AKEyXzUroJszNWswLYP88txHIeevboE-2DM-AyteY5RYK63d0p-KS-aC7xr8XqqpzC
OvEUWNWbQ
```

70.    When  a user enters a query into ChatGPT, Defendant discloses that information to Google via the Google Analytics code.

```
dl: https://chatgpt.com/c/69f13202-4790-83ea-9ae4-94b7a2852314
dr: https://chatgpt.com/
sid: 1777414101
sct: 2
seg: 1
dt: Super Bowl 2005 Winner
en: page_view
```

71.    Transmissions from users' browsers to Google occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Google's embedded code, written in JavaScript, sends secret instructions back to the individual's browser,

21

without alerting the individual that this is happening. The Pixel, installed by Defendant causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to Google's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Google's code and concurrent with the communications with the host website.

72.    Google receives each request from the ChatGPT via Google Analytics and immediately views the information contained therein, processes it, and adds it to datasets to target advertisements in the manner described above.

**D.    Users Enter Confidential Information Into The Website They Expect To Remain Private**

73.    Defendant knows that users communicate highly sensitive personal information into ChatGPT. For example, Defendant's own study found that 29% of all non-work related messages to ChatGPT were messages "when a user expresses views or feelings to ChatGPT," meaning the user is conversing with the chatbot in the way you would converse with a trusted human being.[64]

74.    Similarly, Defendant touts ChatGPT as a "healthcare ally" and claims "more than 40 million people consult the platform every day for health information."[65]

75.    Defendant also admits that "more than 200 million people come to ChatGPTevery month for budgeting, questions about their investments, comparing different paths, planning for future goals, and more."[66]

---

[64] OpenAI, Signals consumer data, https://openai.com/signals/data/.

[65] NPR, ChatGPT might give you bad medical advice, studies warn, March 11, 2026, https://www.npr.org/2026/03/11/nx-s1-5744035/chatgpt-might-give-you-bad-medical-advice-studies-warn (citing AI as a Healthcare Ally (OpenAI 2026), available at https://cdn.openai.com/pdf/2cb29276-68cd-4ec6-a5f4-c01c5e7a36e9/OpenAI-AI-as-a-Healthcare-Ally-Jan-2026.pdf?utm_source=chatgpt.com).

[66] OpenAI, A new personal finance experience in ChatGPT, May 15, 2026, https://openai.com/index/personal-finance-chatgpt/.

CASE NO. 3:26-CV-03000-H-GC

76. In short, Defendant is encouraging users to express opinions to and seek advice from the Website that they would otherwise only trust to close confidants and licensed professionals who are subject to laws limiting the disclosure of this information, such as the Gramm-Leach-Bliley Act (GLBA) and Health Insurance Portability and Accountability Act (HIPPA). Users reasonably expect this information to remain confidential in the way it would remain confidential in daily life. Defendant allowing third party advertisers to intercept this information runs contrary to those expectations.

77. In addition to the specific health and financial information discussed above, users have "a reasonable expectation that the immense amount of personally identifiable and [chat] data allegedly collected by the Tracking Technologies would not be shared with third parties." *Jones v. Skullcandy, Inc.*, 2026 WL 699819, at *18 (S.D. Cal. Mar. 12, 2026).

## CLASS ALLEGATIONS

78. **Class Definition:** Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of themself and other similarly situated individuals defined as all persons who, during the class period, had their personally identifiable information and communications with ChatGPT disclosed to third party entities, as a result of using the Website (the "Class").

79. **California Subclass:** Plaintiff also brings this action on behalf of themself and other similarly situated individuals defined as all California residents who, during the class period, had their personally identifiable information and communications with ChatGPT disclosed to third party entities, as a result of using the Website while in California (the "California Subclass").

80. Plaintiff reserves the right to modify the class or subclass definition or add sub-classes as necessary prior to filing a motion for class certification.

81. Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest;

CASE NO. 3:26-CV-03000-H-GC

any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

82.    Numerosity/Ascertainability.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are millions of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Meta and Google.

83.    Typicality.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had her PII and communications intercepted by third parties without her express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

84.    Adequacy.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

85.    Common Questions of Law and Fact Predominate/Well Defined Community of Interest.  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class includes:

24

CASE NO. 3:26-CV-03000-H-GC

(a)    Whether Defendant intentionally installed wiretaps into the code of its Website;

(b)    Whether Defendant's Website contains code that permits third parties, such as Meta and Google, to intercept users' PII, and related communications;

(c)    Whether Meta and Google are third-party eavesdroppers;

(d)    Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(e)    Whether Defendant's conduct, which allowed Meta and Google—unauthorized persons—to view Plaintiff's and Class Members' PII and communications, resulted in a breach of confidentiality;

(f)    Whether Defendant violated Plaintiff's and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel and Google Analytics, to allow third parties to intercept users' online communications along with information that uniquely identified them;

(g)    Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statute; and

(h)    Whether Defendant's actions violate Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law.

86.    <u>Superiority.</u>  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of

proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## COUNT I
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*

87.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

88.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

89.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

90.    The ECPA protects both sending and the receipt of communications.

91.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

92.    The transmission of Plaintiff's PII and communications to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

93.    The transmission of PII and sensitive information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

94. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

95. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

96. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

97. The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Defendant and the Third Parties used to track Plaintiff and Class Members' communications while they were navigating the Website;

    b. Plaintiff's and Class Members' browsers;

    c. Plaintiff's and Class Members' mobile devices;

    d. Defendant's and the Third Parties's web and ad servers;

    e. The plan the Defendant and the Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

98. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

99. By utilizing and embedding the tracking technology provided by the Third Parties on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

27

100.  Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by Meta and Google on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and communications to Third Parties.

101.  Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific queries they entered into ChatGPT.  This confidential information is then monetized for targeted advertising purposes, among other things.

102.  By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to the Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

103.  By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

104.  Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, CIPA and invasion of privacy, among others.

105.  The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of

28

Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

106.   Defendant was not acting under the color of law to intercept Plaintiff and Class members' wire or electronic communications.

107.   Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff  and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

108.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

109.   As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

### COUNT II
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**

110.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

111.   The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the

29

development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ."  Cal. Penal Code § 630.

112.   A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

113.   Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

114.   To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

115.   At all relevant times, Defendant aided, agreed with, and conspired with Meta, and Google to track and intercept Plaintiff's and Class Members' internet communications while using the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

116.   Defendant, when aiding and assisting the wiretapping, which occurred in California, intended to help Meta and Google learn some meaning of the content of users' queries to ChatGPT.

30

117.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and Google Analytics fall under the broad catch-all category of "any other manner":

a.   The computer codes and programs Meta and Google used to track Plaintiff's and Class Members' communications while they were using ChatGPT;

b.   Plaintiff's and Class Members' browsers;

c.   Plaintiff's and Class Members' computing and mobile devices;

d.   Meta's and Google's web and ad servers;

e.   The web and ad-servers from which Meta and Google tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to use ChatGPT;

f.   The computer codes and programs used by Meta and Google to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website; and

g.   The plan Meta and Google carried out to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to use the Website.

118.   As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent.

119.   As a result of the above violations, Defendant is liable to Plaintiff and other California Subclass Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action

31

pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

120.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

121.   Cal. Under the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10 Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

122.   Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

123.   Plaintiff's and Class members' communications to Defendant, including their sensitive personal, financial, medical, and other information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

124.   Plaintiff and Class Members expected their communications to be confined to Defendant in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect the Third Parties secretly eavesdrop upon or record this confidential information and their communications.

125.   Meta and Google's tracking technology, are both electronic amplifying or recording devices for purposes of § 632.

126.   By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Defendant through this technology, Meta

32

and Google eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

127.   At no time did Plaintiff or Class Members consent to the Third Parties' conduct, nor could they reasonably expect that their communications would be overheard or recorded by the Third Parties.

128.   Meta and Google each utilized Plaintiff's and Class Members' sensitive personal information for its own purposes, including for targeted advertising.

129.   Plaintiff and California Subclass Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

130.   Plaintiff and California Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and California Subclass Members' sensitive data has been collected, viewed, accessed, stored, by Meta and Google, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law.  Plaintiff and California Subclass Members are accordingly entitled to injunctive relief.

## COUNT IV
**Invasion of Privacy Under California's Constitution/Intrusion Upon Seclusion**

131.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the members of the Class.

132.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not

33

CASE NO. 3:26-CV-03000-H-GC

limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

133.   At all relevant times, by using the Facebook Pixel and Google Analytics to record and communicate users' identifying information, alongside their confidential communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution, as well as intruded upon Plaintiff's and Class Members' seclusion.

134.   Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

135.   Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private communications alongside their personally identifiable information.

136.   This invasion of privacy was serious in nature, scope, and impact because it related to patients' private communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

137.   Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution and common law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of themself and Class Members, request judgment against Defendant and that the Court grant the following:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and Plaintiff's attorneys as Class Counsel to represent the Class Members.

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and

34

Class Members;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated:  August 5, 2026                    **BURSOR & FISHER, P.A**.


By:    */s/ Philip L. Fraietta*
            Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: 914-874-0710
Facsimile: 914-206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

35

**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  jwilner@bursor.com

*Attorneys for Plaintiff*

36